Michael Celio of Gibson Dunn, on behalf of appellants. I'd like to reserve three minutes for rebuttal, please. I rise today in a privileged position that my opponent has conceded the decision of the district court must be reversed. The question that remains today then is whether that reversal ends the case or whether there is more for the district court to resolve. My task today is to persuade you that Mr. Roth's concession that Rule 16b3 does not contain a purpose requirement ends the case. Let me explain why I believe that it does. As the court knows, Section 16 of the Securities Exchange Act imposes essentially strict liability on corporate insiders who buy and sell company securities within a six-month period. Rule 16b3 thereunder provides exception for transactions that would otherwise be covered if they were approved by the company's board or shareholders. D1 is the board, D2 is the shareholders. Here both occur. Counsel, just a second. Pardon me for interrupting here, but I just want to be sure that you've recited the statute and the rule. From your perspective, is there any ambiguity of any kind in either the statute or the rule in 16b3? No, sir. And I'm going to explain that, but let me get to it now because I think it's actually, why don't we just start there? There are three things the rule requires, and I think the case that we want to keep in mind when we're talking about this is the Supreme Court's decision, Kaiser v. Wilkie. And Justice Kagan writes an impassioned opinion there, and she says, there's only ambiguity if it's genuinely ambiguous. And then she goes on to say something I've never seen the Supreme Court say. She says, we mean it. We really mean it. And I've never actually seen the Supreme Court say we mean it in an opinion. Here there are three things that the rule requires. It's a who, it's a what, and it's a how. The who, company and a director. It can also be an officer, that's not relevant here. The what is company securities, and the how is the approval, either the board or the shareholders. In this case, two of the three are totally undisputed, and half of the other ones are undisputed. Okay, so the how is undisputed. Everyone agrees there's approval by both, right? The what is undisputed, company securities. The who, the half that's undisputed is that the company is on one side of it. What we're arguing about in this case is the other half of the who. Who is it that did this? And the decision below, holding aside the purpose requirement that I think is now undisputed, the question is, did John Doar do this, or did Forrest do this? And so there's no ambiguity because you look at those words, skip ahead here and just sort of read it exactly. A transaction between the issuer, delighting a parenthetical here, and an officer and director of the issuer that involves issuer equity securities shall be exempt from section 16b, and if it meets the conditions, sure, that's approval, okay? Those are normal English words. There is nothing difficult about that. The ambiguity that exists is the normal ambiguity of applying a factual record to a legal standard. So from Mr. Doar and Ms. Forrest's perspective, you want us to resolve this case based upon the idea this is a transaction. Yes, sir. We would never get to the director by designation issue, is that correct? That's correct, your honor. I don't understand why we do that because it has to be between a director or an officer, and Forrest is neither. Yes, ma'am, that's right. Forrest is neither, and our argument is not... Forrest is the one who purchased those securities. Yes, your honor, that's right. The word between is where I want to focus. We use the word between... Isn't that focusing rather narrowly on what this is? Well, let me try... Give me a second to try to persuade you, okay? A transaction between two people. Let me give you a couple of examples. This morning, I went to Starbucks, okay, and I ordered a cup of coffee. I paid with a credit card, okay? The money that went to Starbucks came from Chase Bank, not from Michael Celia. But when Starbucks made the coffee and put it out there, they wrote Michael, I just spelled it, but Michael on the cup. We're not asking whether you are an owner or director of Starbucks. No, the point is that the transaction is between, and so you look at the factual record here, and the district court, very experienced district judge said there are... Very experienced district court who both sides concede made a fundamental error in this case, so we have to reverse. Even the best judges every so often make a mistake, Your Honor. Okay, well, I'm just saying perhaps there's another mistake here. I don't think there is, Your Honor, because I think a transaction is between, and you look at the real parties in interest. That's our contention. You do, really? Yes. Under security law? Yes, you really do. And where does the statute say that unambiguously? So this isn't... It's just a question of plain statutory construction. There's no particular rule that says you look at this or that. You just look at whether it's between directors. In this case, I mean, I think... Let me put it to you this way. I'm not saying that there's an absolute rule that you always do that. I think what you do is you look at particular cases. So there may be cases that are particularly difficult to figure out whether the director is the real party behind this. So for example, there's the Drayling case in this court where... Can you give me a case interpreting this that says you look at the real party in interest? Again, the words we're looking at are between... You're making the legal argument that when we're looking at these words, we look at who the real party in interest is. I'm saying that you take a look at the words of the statute, a transaction between the issuer and an officer or director, and the normal way we use those words in English can be very broad. It can be narrow. It depends on the facts and circumstances of the case. It's not legally ambiguous. A district judge should look at the record and figure out whether or not this is a transaction between the director... Can we send it back down to the district court and let her figure that out? Well, I think you can. I think she already considered that. I mean, I think that that's one of the things that when she issued her 1292 order, what she said to your honors was, if there's no purpose requirement, I believe this case is over. That's what she said. And again, there are... The key question is, is Forrest a director or officer by deputization? Did Forrest deputize Dorr? Respectfully, Your Honor, that's not our argument here. And if that needs... No, that's not your argument. I mean, you cannot say under any real world sense that Forrest is a director or an officer. Precisely. That is not our argument. Our argument... Wait a minute. I respect that point, but I'm not sure from your perspective that that's necessarily the approach you may want to take. Because the reality is here, Mr. Dorr and I own 100% of Forrest. That's different than Dry Link. You have a big company and you don't know who he's representing whom. Were we to send the issue of whether Mr. Dorr sitting there on behalf of Forrest was by deputization, the answer is 1000%. Yeah, he was. He controlled everything. He's ipso facto a director by deputization. So if he is, even if the transaction argument has some play in the joints for the reason my colleague just mentioned, doesn't your client have some legs with this concept that because the Dorrs own 100% of B? That's precisely right, Your Honor. And I like your articulation much better than my own. I would point the court to the record in, I think, 1, 2, 3, 4, 5, 6 particular places. Page 224, 225, 305, 306, and then 324 and 331. Those are places in the record where it's the same. So are you arguing alter ego theory? Not in those words, but I think that it is something like that. Are you arguing that Dorr's indirect pecuniary interest in the transaction is exempt? Yes. Our view is that this, well, so our view is that the word here is transactions, okay? That it's not interest, it's not individuals. I think that is unambiguous, the transaction. And the securities laws know how to differentiate those two concepts. And if you look at Section 12 of the 33 Act, for instance, that's a very individual-based thing. Section 16 very clearly is transactions. I'm inclined to agree with you, but what do we do then? You're probably going to say Kaiser, but what do you do with the SEC's position now that, hey, you know, transactions doesn't really cut it? The problem with the SEC's position is the same problem that there was with the purpose requirement. If this idea of pecuniary interest, this idea of direct, indirect, it's just not in the rule. And under Kaiser, Justice Kagan's very clear. The words mean what they mean, and that's the end of it. And so- I think you're asking us to describe a different meaning, Jim. I would, I mean, I think that if we sent this back, I think there'd be no problem finding the facts to support the deputization. But that hasn't been found. It has not. It's true that we raised that issue with the district court, and the district court did not go our way on the director by deputization issue. But I think that the facts are clear, and I think that going back, I think that the court has said pretty clearly, the district court has said pretty clearly what she's going to do. If we need to go back to take that extra step, obviously, that's fine. But, and of course, my colleague is correct in the sense that we don't do fact finding. But if something is 100% only one way, then it's ipso facto correct, right? And this is, and the record here, I don't, obviously, this is not the court where we get into facts, but I mean, the record, the judicially noticeable facts, which I think you can consider, are 100% in one direction here. I mean, there's no rule 11 compliant allegation that the other side can make. There's someone else involved. So why not send it back and have her make those findings? I mean, that's, I guess, my biggest problem with the department is that the facts may be there, and that we don't make findings. Well, she's, I think that Judge Gonzalez-Rogers told you what her findings were, and I think that they're sort of very clear. She thinks that basically this, not basically, this transaction qualifies unquestionably if there's no purpose requirement. I mean, I think her 1292 order, and I note, I'm proud to say, I think the only one she's ever signed, the only time she's ever come to this court for guidance, she says this case is easy unless there's a purpose requirement. And so, I mean, I think that that's an important thing to keep in mind here is that she's told you where she's going. The court has, it has told. So you wanted to reserve some time, let me ask one last question though. If the panel finds that Doar's indirect pecuniary interest in the transaction is exempt, and if we send it back because Doar is 100% owner of Forrest, what gets disgorged, even if it's not found that Forrest was a director by deputization? Well, so that's an issue that's not before you, but I can answer it pretty briefly. There's nothing to disgorge here. I mean, I think technically these could, I mean, the district court found these could be purchases and sales, but the money only went in here. I mean, that's the interesting thing about this case. Mr. Doar rode to the rescue on a white horse here investing $70 million in a company that was going to fail otherwise. He didn't take a penny out. So the idea of disgorgement is just something that is strange here. I mean, it's a very interesting case. Good morning. May it please the court. My name is Glenn Ostrager. I'm here with my partner, Josh Brightman, on behalf of plaintiff and appellee Andrew Roth. I agree with the court that if Doar is a director by deputization, then Forrest transaction would be exempt. So let's, as long as you brought that up. Okay. Okay. You want to say that? I would want to say that, that judge Rogers found in her decision on the motion to dismiss that there was no evidence in the record at ER 10. She, she held, there was no evidence in the record that Doar was in fact deputized by Forrest. What does that mean though? I mean, there's a biblical phrase about somebody straining at a gnat and swallowing a camel. This case reminds me of that. It's absurd. It's just absurd, in my opinion, to have to send this back at great expense to all the parties, to the district court, for the district court to determine that the doors who own 100% of this entity are not going to say it's by deputization. Why wouldn't they say that? That's clearly what the evidence would show. You've got the proxy statement, you've got the vote, everybody knows. You even say in your pleading, you recognize he owns 100% of this company. Your honor, with all due respect, defendants argued for the district court that Mr. Doar owns all the quote unquote membership interests in, in, in Forrest, in, in Forrest Ventures. We, we explain in our, in our brief, in our briefs that membership interest is not a defined term under the Delaware law. And in fact, the Delaware chancellery court has said that it, it means a bundle of rights, which are set forth in an LLC agreement. And, and the cases that we cite are in our appeal brief reply at page nine, note two, are Bamford v. Penfold in, and also. Are you, are you, are you saying that with respect to In recoinment LLC, and that's in our appeal reply brief at page nine, note two, what I'm saying is. I'm saying that with respect to the deputization issue that Fortas and Doar had to specifically, and Hikeverba say that this is a, a director by deputization or doesn't qualify. I'm saying that, that the company Amaris has to be aware under, under this court's decision and driving the American Express that missed it and that, that 458 F third 942. Yeah. But that, but that case, Judge McKeon wrote that case and that dealt with a very different situation. You know, that was American Express. It's a great big public company. You got somebody that they maybe they work for the company. You had to have some whatever you want to call it. It's in the proxy statement. It's in the records of the, of the, of the corporation. There was even a vote by the shareholders and by the voting portion, I think it was like 99.7% said that they knew that Doar owned the whole company. So what's, what's the problem? That, that is not the case, Your Honor. The, the, the proxy statement discloses that Mr. Doar has beneficial ownership, which they define as voting and investment power, which is under SEC rule 13-3 and under the SEC rule governing short-swing profits 16A, 16A-1, 1A1. That is used for determining whether somebody is a greater than 10% beneficial owner. Are you suggesting that Doar is not 100% owner of Forrest? I'm saying it's a fact question and there's no evidence in the record that he owns 100% of Forrest. And, and under, under the SEC regulations, there are two types of beneficial ownership. One type is in rule 16A-1A1, which defines beneficial ownership in terms of voting and investment power for, and that's for purposes of determining whether somebody is a greater than 10% owner for purposes of insider status. I don't remember you arguing that in your brief. Yes, we did. We, we put it in our briefs and, and, and, and, and defendants, you know, address that. You argued that, that Doar is not 100% owner of Forrest. We, we argue that it's a fact question and that, and that the district court, I think, was misled by the, by disclosures by defendants. And it comes up in the context. Well, actually the district court said neither the allegations in the complaint, nor those documents of which judicial notice has been taken, suffice to find as a matter of law that Forrest and BBT are directors by deputization. That's correct. So that's the record we have, and that's the finding she made. And she says that specifically the court cannot determine whether Jay Doar was in fact deputized by Forrest and BBT either expressly or impliedly. And if so, whether the board was aware of the deputization when approving the transactions. So I, I just don't know how we can go ahead and decide if they were. If you would bear with me for one moment. In order to establish an exemption under Rule 16b-3, defendants, it's an affirmative defense, and in this, in this court's decision in re-manufacturing the re, which is 295 F second 473 at page 475, they bear that burden. On the motion to dismiss, the court found that that there's an insufficient record to support defendant's assertion in their motion to dismiss that Mr. Doar is, or that Forrest is a director by deputization. The court then turned to the American Bar Association interpretive letter, and that letter addresses the question of whether Mr. Doar as a director who has an indirect interest in, in the amorous Forrest transactions, whether that indirect interest is, can be exempt. And the American Bar Association interpretive letter provides that, and as, as defined by the SEC in its amicus brief in this case, that Mr. Doar has to establish for that that the amorous board was aware of the existence and extent of his indirect pecuniary interest in the transactions. That is a requirement of, of note three. Let's just say, arguendo, that based upon the proxy statement, based upon your pleading, based upon what the record shows, that we are convinced that Mr. Doar owns 100 percent of whatever interests there are in Forrest, however one defines them. Does that make any difference in what we, as a court, do with this matter in terms of the deputization issue? Respectfully, Your Honor, I, I would submit that under, that under Rule 16b-3, and the jurisprudence of this American Express, and in view of the SEC's position, you know, positions regarding that issue in its 1996 adopting release, or for, for clarification of the coverage of Rule 16b-3, and in its, its 1999 American Bar Association interpretive letter, as well as its 2005 release, which are all cited by, by the SEC in its amicus brief, that, that there are different interests here. There's, it's direct, it's not disputed in this case that, that Forrest has 100 percent pecuniary interest and ownership of all of the, all of the, all, all of these, the equities subject to these transactions. Forrest... You're saying he does, or does not have all of those? No, I'm saying that Forrest Ventures, the entity... Right. You know, we, we have the Lahoe Trust, which is the sole member of Forrest Ventures, and we have Mr. Doar, who's a trustee with his wife of Lahoe Trust with respect to, and with respect to Forrest Ventures. And what I'm saying is that entity, you know, under the SEC regulations, is not entitled to an exemption unless, unless it's directed by deposition. And that's because it's a greater than 10 percent... Okay, let's, let's, let's, let's have you be the counsel for the company. You've got a man who's going to put in, I think your opposing counsel said $70 million to save the entity we're talking about in the first place. All the shareholders benefit by that, right? That may be, they, I don't know the exact amount, but they put a lot of... Let's say they do. Okay. What possible interest does Mr. Ra have to try to unravel that, since as a practical matter, everybody knows that entity... I'm respectfully, Your Honor, that's that question to the district court. The district court, you know, looked at the proxy statement. The proxy statement states at pages, at pages... I've got the proxy statement. That's your... At 224 and 227-29. The proxy statement says that they received information from Mr. Doar as to his interests, and they looked at Form 4 filings, 13Ds, and all of these documents disclose that Mr. Doar has beneficial ownership, which is defined as voting and investment power, which is distinct from pecuniary interest, which is defined in SEC Rule 16A-1A2, which is economic interest. So basically this boils down to a semantic definition of the nature of the Doors holding from your perspective. Is that correct? It's not semantic. There's a factual question as to what he owns. Yeah, I can tell you. You're saying that a membership interest, he owns 100% membership interest. You're saying that's defined as X in the regulation, and somebody else says it's beneficial. That's defined the way it is in the regulations, and that's not enough. You've got to have a hearing before the district court from your perspective in which it's clear that Doar, from your perspective, owns all the bundle of stakes. Respectfully. The Leho Trust is the sole member of... Which is 100% owned by Doar. That is a fact question, which is not in the record. All that's in the record is that there's something called a membership interest, and we argued to the district court that that's not a term. We argued in our briefs that that presents fact issues, which have to be determined by the court. So your position that the Leho Trust might be owned by somebody in addition to Doar or other than Doar? Well, I would say that we would have to see the LLC agreement to know what membership interest means, and we don't have that because this was a motion to dismiss. I'm also suggesting that... Well, do you have any information that somebody else other than Doar might own? All I know is that the Leho Trust is the sole member of Forest Ventures. It has all the membership interest, right? The membership interest could be just voting and investment power. We don't have any disclosures to what membership interest means, and the burden is upon the defendants. Let me ask you this. If the panel finds that Doar's indirect pecuniary interest in the transaction is exempt, and we find that Doar owns 100% of the Leho Trust, which owns 100% of Forest, what gets disgorged, even if it's not found that Forest was a director by deputization? If we... Again, I respectfully submit that the question of membership interest raises fact questions as to what it means, but let's take your hypothetical. Let's assume we have discovery, and Mr. Doar comes forward and he says, I own... There are no other beneficiaries of this trust. I own it outright. I set up this trust. I own everything. It's all mine. I did it for some tax purpose, and I own the entirety of Forest Ventures. I have 100% indirect pecuniary interest. The SEC takes the position in their amicus brief that notwithstanding, the only way that Forest Ventures is entitled to an exemption under 16B-3 is if they can establish that it's a director by deputization, and I would say that the proxy statement and other filings, 8Ks, all identify Mr. Doar as an independent director who is not deputized by Forest. Well, what gets disgorged to present it back, and it's found that Forest is not a director by deputization? Under the governing law, the party who owns the direct interest is... Both the direct and the indirect parties or interests are joint and severally liable, so that makes... Well, if Doar owns a direct or indirect interest, doesn't he get exemption? He doesn't assert that he owns a direct interest. He asserts that he owns an indirect interest. Well, doesn't he get the exemption that way too? His indirect interest could conceivably be exempt if he can establish his affirmative defense, but that doesn't provide an exemption to Forest Ventures. In analytical surveys, the Tonger partners... Well, let me go back. I'm saying if Doar's exempt as an indirect interest... His indirect interest, not the direct interest. Okay. Well, what gets disgorged then? If you want to send it back... The profits that Forest Ventures realized in these transactions are disgorged to the company. The reason for this is... The rationale for this is that if Forest Ventures is a greater than 10% holder, it's not subject to the fiduciary restraints upon speculative abuse that a director is, and so it's subject to liability for its short swing profits. And so I would say that in... I would refer the court to analytical surveys v. Tonger, which is 684 F3rd 36. And this is, unfortunately, a second circuit case dated 2012. And in this case, the court explains that at page 52, the court explains that there are direct and indirect interests and the parties are jointly and severally liable. And so Forest would be primarily liable. And to the extent that the judgment wasn't satisfied, then it would roll over to the secondary party. Can I ask you one other thing? You're over time, but it's... What's in this for Mr. Roth? What are the claims wrongdoing? Well, the Section 16b... I don't know what that says. I want to know what Mr. Roth... Mr. Roth, he's a shareholder representative. He's brought this on behalf of the company. I understand that. What money is involved? He has no financial interest. He's just doing this out of the goodness of his heart. And you are too, I assume. No, I'm not doing this out of goodness of my heart, Your Honor. I'm litigating... Is that what's driving this? Well, I would say this, Your Honor, that this is over... I would say over 40 years, we have recovered for corporate America very substantial monies for violation of the statute. It's a strict liability statute and it extends to violations of the statute, whether there's wrongdoing or not. So basically, if I understand you correctly, what you're saying is this is what you and your colleagues do for a living. Mr. Roth is a nominal plaintiff and you want to get what you can based upon your construction of the statute and the rights. Is that correct? That's how Section 16b works. The Congress thought that the way to enforce the statute was to incentivize private attorney generals to bring actions on behalf of corporate issues who are not inclined to do that. So for example, it's rare for a corporate issuer ever to seek disgorgement, even if it's black and white that there's been... where we don't have... it's a black and white example of a black and white violation of the statute. And if Mr. Doar, through Vallejo or whatever entity, or Fortas, contributed $70 million, where in did he benefit? Well, what he did was in these transactions, he received millions of options and warrants and the like. And then when the stock went down in value, he went back to the company and he renegotiated and he reduced the strike prices. And so he benefits. I don't question that Mr. Doar is a philanthropist, but this is a business proposition for Mr. Doar. And Mr. Doar has engineered transactions with the company, or more precisely, Forrest Ventures has engineered transactions in which Mr. Doar says he has an indirect interest. What that is, I don't know. It's not in the record. It's an affirmative... he has to establish his entitlement to an exemption of his indirect interest. And the SEC has said that means he had when the board approved the transaction, they had to know what his pecuniary interest was in the transaction. That's nowhere on the record. All that's in the record is that he's effectively managing or has some management role vis-a-vis Forrest Ventures because he has beneficial ownership for purposes of reporting. And in fact, he filed form fours, which are in the district court record and one is in the record on appeal, which is... in which he disclaims, it's at page ER-322, he disclaims in the footnotes beneficial ownership except to the extent of his pecuniary interest. And then there are about six or seven other form fours, which are in the record at the district court level. And in each one, Mr. Doar disclaims beneficial ownership, that's A-1, voting and investment power, except to the extent of his pecuniary interest. So that begs the question. If he's saying he's disclaiming beneficial ownership except to the extent of his pecuniary interest, he obviously doesn't have a hundred percent pecuniary interest. Maybe I don't want to speculate because it's not in the record. But what I would say is that the purposes of the statute are fulfilled by holding Forrest liable. If under the US Supreme Court and reliance, an insider can structure transactions to avoid the statute, but if you don't structure it properly, then you're liable under the statute. And so that's what we have here. We do not know who owns, who are the beneficiaries of that trust. Let me just ask you, if Doar was the sole beneficiary, then you'd agree that he'd be entitled to the exemption of indirect interest? He would be entitled to an exemption for his indirect interest if the board had been aware of his pecuniary interest when they approved the transaction. Now, there's nothing in the record to show what his pecuniary interest is, so he's not entitled to an exemption, but they can establish on remand that the board was aware of that pecuniary interest, but it's not in the record as of now. And so I would say that Mr. Doar is a very sophisticated businessman. He's represented by very sophisticated attorneys. And what we have here is a complex structure that's been set up and Forrest has 100% pecuniary interest in all of these transactions. And it's primarily liable for the short swing trades. And the short swing trades, if one studies them, they're not before the court now, it shows that through his influence, he increased his opportunity for, or Forrest Ventures increased its opportunity to realize very, very substantial monies. Because if you lower a, for example, a warrant or an option from a $7 strike price to a dollar or two, and you have millions and millions of these shares, and there are a number of these transactions, these were very substantial numbers. And so if the defendants want to claim an exemption, they have to, what the SEC is saying in this brief, and that brief is entitled to our Kaiser deference. And this court in driving the American Express also cites to our and says that it should be given controlling weight. And Kaiser says that there should be deference unless the SEC's interpretation is clearly erroneous and not consistent with the regulations. Everybody agrees that 16B-3 is very, very definite. It's very, very definite transactions between an issue and its offices of directors. What happened here is the SEC by interpretation, there's no reference to indirect interest in 16B-3 by what the SEC did by interpretation in the American Bar Association letter. And then what they did was they said, the American Bar Association submitted a letter to the SEC and said, wouldn't it be reasonable to exempt a director or an office's indirect interest in a transaction between the issuer and an entity in which the director has an indirect interest? And they laid out the criteria set forth in what became the American Bar Association interpretive letter. And the purpose-specific was one of the criteria. And- All right, counsel, you are so over your- I thank you very much. I see you haven't been spotted because my colleagues were- But thank you so very much. Thank you very much for your time. Thank you very much. Thank you very much. Okay, Mr. Celio. Your Honor, given how far over time we are, I will just make three points. One responsive to Judge Smith, one responsive to Judge Reyes, and then a meta point. There is no remote chance that there is somebody else other than John Doar behind this. This is not a factual question that the district court has some special insight into. The district court had the same record you have before you. Right, and that's what really troubles me. She said she could not make that finding on this record. And what bothers me about your position is that if it is true that it's 100 percent, it's 100 percent, why are you so opposed to us remanding and putting that- the evidence that will convince Judge Gonzalez Rogers of that? And so she can make that factual finding. It shouldn't be days and days and days of hearing. Judge Smith, I think, answered the question in the form of one of his questions, which is, it's incredibly expensive and incredibly time-consuming in a situation like this to go back and keep doing this and keep doing this and keep doing this in a situation that is such an extreme education. This is once. This is once. And the evidence is not in the record that he owns 100 percent. I think that the evidence is in the record that it's 100 percent and more to the point. We would have to be saying Chief Judge Gonzalez Rogers clearly erred when she said that. I think what I'm saying is that there is not a rule 11 basis. In the Twombly-Iqbal era, you can't just say maybe somebody else owns it. You have to have some kind of good faith basis. You don't have to have evidence. You have to prove it. I fully concede that. But you have to have something that you can say that there's somebody else here. There's nothing like that. Everybody knows- Isn't the burden of proof on you for in the record where this is disclosed? These are semantic distinctions. These are attempts to wriggle in to stay alive one more day. The context here is really important, and this is why I wanted to get to Judge Reyes's question. They're basically saying, our friends on the other side, that you can't tax the man, but you can tax the man's bank account. I mean, that's essentially what this is, is that you can't take it out of his left pocket, but you get to take it out of his right pocket. That is not what this statute was intended to be. Let me just read the first few words of Section 16b that Congress passed for the purpose of preventing the unfair use of information. That's what this statute is supposed to be about. There is not the slightest, remotest chance that there was something unfair here. Frankly, if Mr. Gore hadn't done this, and that's what we're setting up. He's got to go back and prove this factually, if we've got to go to summary judgment, if we've got to go to trial on this. You are discouraging people from doing this. You're discouraging directors from coming to the rescue of their company. This isn't just okay corporate behavior. This is the gold standard of corporate behavior. $70 million, nobody else would loan them any money. He saved the day. Mr. Roth wouldn't have a claim because he wouldn't be a shareholder anymore. The company would have been out of business, and he wouldn't have standing. There's a great irony in that. Let me ask you this. You started off with the concept, and part of my request, we have the statute, we have the regulation. You said it's unambiguous. Under the circumstances, if we follow a transactional approach, how do we deal with the fact that it does talk about officers and directors, and it's Forrest that's on the hook of this part of the case, how would you answer your colleague on the other side to distinguish that without a deputization argument? Interestingly, everyone in this case actually agrees that indirect interests are covered by the rule. That's the SEC's brief at 14 to 15. That's our colleague's brief at 9 to 10. Obviously, we agree. Everyone actually believes, and this has been an interesting conversation we've had here today, because all the parties that are presenting this to the court actually believe that indirect interests are covered by the rule. No one is before you today, your honors, taking the position that only directors quad directors. I would urge the court to look specifically at the concessions at page 9 to 10 of their brief and 14 to 15 of the SEC's brief that indirect interests count. If the position that our friends on the other side are taking, that basically has no meaning. Essentially, those two things can't be true. You have to be a director by deputization, but the indirect interests can be exempted. Again, I want to close with the meta point. What Congress was doing with Section 16b, with this onerous rule where there's no scienter requirement, is trying to protect companies from unfair practices by insiders. This is the opposite. I don't think that this is actually a great vehicle to set the rules for Section 16b more generally, because this is such an extreme case where basically... I know the answer to why he did this. It's outside the record, but I think you can look at the fact that there's the John and Ann Dorr of climate change at Stanford University for a clue. This is philanthropic at this point to put $70 million into this company. He saved it because he believes that it's going to change the world. Maybe he's right, maybe he's wrong, but on the strict rules that are in front of you in the statute and in the rules, he's not biased. Let me ask you this. Let's pretend for a moment that you're one of us and you have a writing assignment. How would you write this opinion? I've given that a lot of thought, Your Honor. I think actually that this is actually pretty easily disposed of. It doesn't even need to be a published opinion, short mem dispo kind of thing, that everyone agrees that the district court was wrong. There's no purpose requirement. The plain rules say that there just has to be the three things, the who, the what, and the how. The only question that's before the court is the who, and everyone agrees that indirect interests count. This is an indirect interest. We're done. For this to be a case where you prevail on everything on the indirect interest exception or privilege, wouldn't we have to find that Doar is 100% owner of Flores? And I think that you can do that quite easily because under Delaware law, a membership, this is on page 11 of our second brief, Document 35, a membership interest in an LLC under Delaware law is a member's share of the profits and losses. That's 6 Delaware Code 18-10110. I think that disposes of that issue. That's what that means. That's why I say when I say, I think this is a semantic distinction about these things, it's under Delaware law. By the way, under Alpha Ventures, this court's decision, that's where we look, right? We look to the underlying law, and so here we would look to Delaware. What do those words mean? It means he owns all of it. Again, there is not a 11 basis to suggest anyone else here. So if we were to adopt your approach, what then happens to the SEC's opinion, if you will? We just ignore it basically under Kaiser? Is that what happens? Well, I think that you can either ignore it under Kaiser or you can say it may well be right in some circumstances, but this is on these particular, this factual record that's before you, this is such an extreme case that it's a bad vehicle for deciding whether the SEC is right or wrong. In the circumstances of this case, to make it right for your argument, is the fact that 100% of Forrest is owned by Doar? I think it's that. I think it's the shareholder vote. I think it's the years of disclosure. I think it's the fact that John Doar is such a prominent member of the community. I think it's the fact that he's a long-standing director, as of today, the longest standing director. I think it's just such an unusual record. I mean, normally there's, you know, you have like drilling where maybe there are factual things. I think not all the I's were dotted and the T's crossed in this case. I think that's what happened because I think if we send it back, you can easily find Doar was a director by deputization, but I don't think we have the on this record as just a court found. Well, I think that that's certainly the court's prerogative. I would say that this is, I would say that, let me close by saying this. The SEC in all of its rulemaking says that it wants clear standards for boards, that it wants things to be easy. And I think that this is a case where this was a no-brainer from a board perspective, from a fiduciary duty perspective. And so I think just saying yes or no in this circumstance, that's what this court should encourage directors to do. Like my colleague said before, did Judge Rogers clearly err here on her determination? There was not enough evidence to make the determination about the ownership interest? I think she erred. I want to be careful that I don't say that the standard is clear error. The review is de novo, of course, before you today. Not on the facts. Excuse me? Not on the facts. Well, right, on a motion to dismiss, there are no facts. I mean, this is... She's been taking all the facts in the light when they say we're both... Right. But certainly this court knows very well what its standards of review are, and I'm certainly not going to argue with the judge of this court about what the standard is. I do think she erred. I do think she erred. I think that the record is sufficient. And frankly, I think it's hard to imagine a record that is more fulsome with disclosure than this one is. I've been doing this 25 years, and I've never seen this level of disclosure. I've never seen a board transaction and a shareholder book. I think that's really... Yeah. And if it's so clear, why are we spending like 15 minutes arguing about it? I think that it's fascinating, and I would be happy to talk another 15 minutes, but I see I'm way over. You're way over too. So I'll just give my colleagues one last chance. Okay. No more questions. Okay. Roth versus Forrest Ventures will be submitted. Thank you. And we will take up  public comments. You are right. Yes, thanks. Thank you. Good afternoon. And please, the court, Anthony Demary here on behalf of State Center Community College District. I appreciate you taking this appeal for discussion today. The position I'm presenting here, there were errors made in granting the initial order, which was an injunction on a co-equal government body. If the failure to determine the forum status, the order clearly made a decision they did not need at the trial court to determine the forum status and the failure to apply the school speech doctrine, which would be under the Planned Parenthood Hazelwood decision, which I'm quite aware that has come before this court before I've reviewed Judge Warlaw's opinion in Oyama. I'm ready to discuss that, why it should apply in this, and why I would agree with you that Oyama was not the best vehicle for application, but that if we follow the four other circuits, 6, 7, 10, and 11, that have applied the Hazelwood school sponsorship doctrine to secondary education of junior colleges and colleges, this is the case, and this is the opportunity. Let me add to this, putting aside from the Hazelwood issue, Board of Airport Commissioners versus City of Los Angeles versus Jews for Jesus, which is a Supreme Court case, says we don't need to consider the nature of the forum in an overbreadth and vagueness case. What's your response to that? It's an interesting question. And so when you look at the cases, when you go to the school sponsored doctrine cases in Hazelwood and in Hazelwood and Planned Parenthood, or two current examples, both of those cases, the forum was discussed. So in you look at what happens in a school speech sponsored case, in those cases, the law is clear. It starts in Hazelwood and goes through on our own Ninth Circuit Planned Parenthood that such great deference is given to the school itself because of the imperpeture issue that the forum does become important. As you know, part of the issue of Hazelwood is you're dealing with either K through 12 or you're dealing with college. In this case, you're dealing with college. But before we get that, your previous regulation, I call it that, indicates that inappropriate or offensive language or themes would not be permitted. Can you give me some examples on what inappropriate or offensive language or themes might be? Certainly. So let's talk about some examples. And then if I could, in that answer, discuss why it's important following Hazelwood and Planned Parenthood that it's not so specific as to start delineating who can get around it. But examples might be when you look at the cases, some of the important factors are the school district's own interest in its education and those things it promotes and those things it doesn't. Slightly outside of the school speech doctrine, you have the bongs for Jesus, bong hips for Jesus, which was not a school speech case, but nonetheless, the important topic right there was, OK, the school has an interest in not promoting drugs and stopping drugs. So there's one. But with respect, you're going to appeal from the question I'm asking. You have this regulation about inappropriate or offensive language or themes. Very vague, very indefinite. I'm asking you, you're one of the administrators now. OK, the ones in this case happen to be confused. They don't quite know what it meant. So I'm asking you, what does it mean? Give me some examples of what that means. You're the administrator now and you're going to say, OK, A, B, C and D meet this criteria. I was that are inappropriate or offensive. That would have been my first one. There would have been the promotion of illegal drug use. OK, what do you want? Everyone have agreed to that. Would everyone in the certainly the people who put it up would not agree to it? Oh, of course not. No. And how are people who are supposed to abide by this to know what is and is not covered? If that's a great question, it goes to this core issue of the deference given to the school district, because certainly I would concede your point. Judge, I would concede your point that when you look at the school sponsored doctrine, none of the cases from Hazelwood on through Planned Parenthood. I'm sorry, even onto our fellow districts have given a specific statement and they're and they're very, very open description. Hazelwood, I believe the statement was immoral. Anything that is immoral or illegal or a similar language I have written down in Planned Parenthood. I think it was very similar. Hazelwood was the principal has the discretion to say if it's legal, moral or ethical. Planned Parenthood, the rule was does not serve the best interest of the school. And the reason I bring that up is you're not going to have a situation when you look at school sponsored doctrine, where the people that want to post will always know what violates those rules. They didn't know it in Hazelwood and they didn't know it in Planned Parenthood. So basically you're saying that a regulation cannot be drafted that would not run afoul potentially of overbreadth and vagueness just because nobody can possibly define all of the things out there that might come in. Is that what you're saying? I'm not. But to explain the point. When I've reviewed the cases, it does start with a form analysis and the form analysis is non-public form. Yeah, but why? I mean, I get your point, but I read you earlier on springboard cases that we don't have to consider that in terms of overbreadth and vagueness cases. So just arguendo for a minute. Let's assume that the form in this to this degree is irrelevant. OK, let's talk about vagueness and overbreadth. I'm struggling with how people are supposed to interpret the language there. It seems like your administrators did have trouble doing that. And that's one of the things that Supreme Court's been pretty clear about. You know, you got to be real careful. You're going to restrict people's speech and their communication. They've got to know exactly what it is that they're doing wrong. And I'm asking you, what are some examples? You said you gave us one and that's probably a good one. But what are some others? Gun violence certainly is one that we'd be very interested in if I was the administrator, because it would also be pertinent to the issues in this case. If a student body member wanted to post with our school a perpetrator and our stamp on it, picture of one person holding a gun to the head of another one. They don't do that. In this case, they were signed by the people who put them up. The school had nothing per se to do with it, unless you get your form analysis, right? I'm sorry. I didn't understand. I understood that what was being placed was these were signed by the people putting them up and the school had nothing to do with it. There was no sign saying the school sponsored it. Is that correct? Only partially, Your Honor. If you look at the record in this case, they were called back in to make an insignia to give a description of their group. But I believe the evidence, I know there are some things that are on motion to dismiss and some on appeal. I believe the evidence here is that there wasn't a handle, a social media handle to a national group. But no, I don't believe it clearly designated that these groups were not under the approval of the school because you had to be approved and stamped to be on the board. And the board, recall, is not a random board. It's our wall. It would be akin to stapling on this wall. So with your example, to take that, it's certainly a point that we looked at coming into today on the over-breath and vagueness. And what you find in this, this is the reason I believe it's so important to get the school-sponsored speech because what you find in the school-sponsored speech is that from the Supreme Court's approval in Hazelwood, all the way through our fellow Sixth District case in the Sixth Circuit, there are less discrete rules that go to the discretion of the school because the imperpeture is going to be attributed back to them, to their own imperpeture. So you had, the reason I worded that way is you had worded your question as, does that mean it can, it's always going to be over-broad and vague? No, Your Honor, what I would say is if the school-sponsored speech case, then the opportunity to be constitutionally compliant allows more freedom and more of a less certain description as we saw in the Hazelwood case. With young people, the K through 12. Well, thus far, thus far in the Ninth Circuit, depending upon how you look at the Brown versus Lee case, thus far it has not been applied but has not been rejected. Four circuits have applied it to the colleges with very similar language to what we have here. And if, can I address that for a moment? Why we should, why we should extend it? If I could address for a moment, why to extend it? And if you look at the Sixth Circuit case, which I believe is the Hostry case, they do a good job of describing that in the Sixth Circuit. And then actually it was one of the citations from the Oyama case from Judge Wardlaw. What they described in that case is that there's very little distinction between high school juniors and seniors and college freshmen. They show that the age or the ages actually can be similar. And sometimes high school students can be older. In our junior colleges today, but of course, by statute and constitution, there's an obligation to provide the education to members of the public here in those junior colleges. And in state center, as a junior colleges around the state, there are joint programs with the high school. So high school students actually come into the campus during their high school years to take classes. So they graduate with their AAs. In addition, these are buildings that are used for other purposes, not just for school purposes, especially the hallways where we have family members, members of the community and certainly children that come through constantly, whether it be for athletics or other purposes that are exposed to these walls. The thing I look at now when you talk about the K through 12, originally in Hazelwood, if you look at the reasons given, there are multiple. One is to control the materials that are presented to K through 12 students, given their age. There are curriculum issues, but the last is the most important. And the last in the Hazelwood, which was described to an extent in Oyama very well, is that other members of the public might reasonably perceive these items to bear the imperpeture of the school. That is not something that is specific to the age of the student. That is the members of the public. That's straight out of the Hazelwood Supreme Court case. That was what we followed in Planned Parenthood, that regardless of the age, others may find that the posting actually is reasonably perceived to bear the imperpeture of the school. And what that causes for the school, not just for curriculum, because in Planned Parenthood, it applied to giving out athletic materials at a game. So you get ads, you put together a brochure and you hand it to members of the public. I'm gonna reserve the last two unless you have questions for me on this. Let me interrupt you and just, I'm gonna change gears just for a second. Yes. Are any of the plaintiffs still enrolled in students in the school? Let me check their names. My belief is no. I will defer to council, but I have been told no. So the answer is that none of the plaintiffs are still enrolled in students in the school. Is that true? I hesitate to say it's true. That is my understanding, but I am not 100% sure. If none of them are still in the school, does that move the case? Their case? I would be pleased if it would. No, I understand, but is that your position? The only problem I have with that position is the individuals would be gone. Young Americans for Freedom is still a party and it is a body. Otherwise, certainly. Let me follow up then. I take it from your argument that the school, it will not disclaim its intent to reenact the policy. Correct. Okay. Yes. I do wanna reserve my time back. Your time is fine, two minutes. You've got it. I'm sorry? You've got your time. Okay. Would you like me to continue now? No, no, you can move back. I will come back and rebut at that time. Thank you, Your Honor. Two minutes and 39 seconds is when you ask first. Thank you, Your Honors. May it please the court. My name is Daniel Ortner from FIRE on behalf of the athletes in this case. Clovis community college officials used an overbroad, vague, and viewpoint discriminatory policy to remove flyers from a student Bolton board merely because of the conservative nature of the speech and that the speech offended some students. The language in the statute that in the FIRE policy that it doesn't allow speech that's offensive or inappropriate is as overbroad and vague as imaginable. It could sweep all kinds of First Amendment protected activity in its reach and it gives Clovis officials unbridled discretion as the record here clearly shows. Do you think the replacement policy is any better? It doesn't have the provision about viewpoint discrimination, which is what's before this court. We may have some disagreements down the line or down the line, we may consider amending a complaint, but before you, the only policy here is this viewpoint discriminatory policy that's now not on the books anymore. So do you think on the motion to take judicial notice, you opposed it, but shouldn't we grant it? This court can take notice of the fact that the new policy doesn't have the provision about offensive and inappropriate speech. I think what we opposed is down the line, what we may or may not do with regard to amending a complaint, that that's what we oppose, speculating about what might happen down the line once we consider our options. What's before the court is this provision that the district court correctly found was viewpoint discriminatory, overbroad and vague at its core. And this provision also, it bans offensive speech, which is textbook viewpoint discrimination that strikes at the core of the First Amendment. And so any of these grounds can be an independent basis for this court to affirm the district court's decision that the preliminary injunction should have been granted. Let me follow up on her question. When Clovis enacted a replacement policy, it did not include the challenge provisions. Correct. On appeal, the parties argue over whether the replacement policy moots the case. I'd like you to assume that we find the appeal is not moot. I'd also like you to assume that we affirm the district court's preliminary injunction order. With those assumptions in mind, here's my question. Could defendants file a motion with the district court asking it to dissolve its preliminary injunction because the replacement policy makes it unlikely plaintiffs will be irreparably harmed while the case proceeds. And if so, would the district court act within its discretion if it dissolved the preliminary injunction order based on the changed circumstances? No, Your Honor. They could file that, but it would be improper to grant it under the Voluntary Cessation Doctrine. This court's case, the FICRA, the FBI case from this court, is really very much on point. And also the opposing counsel actually cited two cases from other circuits, the two speech first cases, one from the Sixth Circuit and I believe one from the Fourth Circuit, that are very similar fact patterns. University has a policy enjoined. They argue now they replace it. They argue now the case is moot. In FICRA, this court said when something is done by an administrative body or an official that can be easily re-implemented, it's not like a legislative enactment, they could easily put it back into place. There's no presumption that they will not do so. And here they've not disclaimed it. They've not said we would not ever reintroduce the policy. They've not admitted it's unlawful. So under the voluntary cessation doctrine, the underlying case would not be moot. I want to get back for just a second to what my colleague raised a minute ago. That's who's still attending FOBIS. I believe the question was who's still there and the thought was nobody of this original group. Is that accurate? The plaintiffs, the individual named plaintiffs have graduated. They were leaders in the student club that is still a chartered recognized club that's going to continue being active at Clovis Community College. OK, and from your perspective, the club itself is the party, then basically it's a representative party or? The current leadership will be replaced shortly. The semester ended and recently they're going to have a new board, new president, new vice president. And they would fill into that role as an individual. Is that now or is it just a titular organization without anybody in it? There are membership. There is membership. It's not in the record for this court, but there is membership. There is a new leadership that's going to continue beyond beyond this. They've already been elected. There is a new president that I believe has been elected. I don't have that in front of me. My understanding is that there is a new leadership. It doesn't matter if you have all three plaintiffs, who, of course, are the first people listed here and they're all gone as to them. They were the only party. The case would be mooted, right? At this point. With regard to prospective relief, we also are seeking damages for past injuries, so that would not be mooted. But for prospective relief, if they were all graduated and had no injury, assuming that capable repetition would not be an exception to move, this would not apply. So your point is, no matter what, there are damages for past injury. As to the future, do you think the organizational standing is sufficient? Yes. YAF is a recognized student club that's posted flyers. They've been targeted repeatedly for discriminatory treatment based on their conservative views. Here, just before you, there's evidence of the two sets of flyers that were rejected because of the conservative views. There's no reason to think that's going to change now that different leaders are in charge of the club. And so YAF would suffer injury and would be able to continue along with the new leadership that would take over. And really, the record shows, I think, ample evidence of viewpoint discrimination. And also, as Judge Smith asked the question, what is inappropriate or offensive to opposing counsel? And the answer was, there's a couple of things you can point to, but it's such a broad category that it carves out all kinds of protective First Amendment expression. The speech in this case is a good example of that. This is political speech about the evils of communism. It's speech about the Supreme Court's case about abortion that was upcoming at the time. These are matters of political concern, hot topics to be discussed on campus. And yet, administrators decided these are inappropriate or offensive. And that really shows the overbreath at work here. And the district court said this as well. There's no conceivable pedagogical reason, even, that a university would enact such a broad ban on any speech that's inappropriate or offensive. So really, regardless of the forum analysis and regardless of whether the student speech doctrine applies, that type of policy is impermissible. That degree of overbreath, the degree of vagueness at heart here, and this, you know, university officials here, their actions exemplify the kind of arbitrary decision-making that offends the First Amendment. And I think the district court said it well, that this, their actions exemplify the kind of arbitrary and discriminatory treatment that the vagueness doctrine is designed to prevent. Deciding to approve the flyers at one point, then someone complains about it. They decide, well, maybe we should take it down. And they use this as a pretext. They use other policies as a pretext to say, oh, it's inappropriate and offensive. That's really exactly the example of what the vagueness doctrine is intended to prevent. How important is it that there was a substantial amount of discretion on the part of the administrators to decide what and what did and did not violate this stricture? Under the vagueness doctrine, the Greenhead case from the Supreme Court kind of sets the standard that there's two ways that a policy could be vague. One is, does it give sufficient guidance to the person who's trying to speak? And two, the second prong is that, does it give arbitrary discretion to government officials? And really, both of those are satisfied here. So each of those would be a reason to declare this flyer policy unlawfully vague. And this opposing counsel doesn't, in the district court and here didn't really dispute any of this. They offered, the district court said, they offered little response to the overbearing challenge. They offered, similarly, little response to the vagueness challenge, why this isn't arbitrary or why this doesn't give arbitrary discretion. They really say that university officials need that kind of overbroad, vague, kind of standardless discretion to impose whatever policies they want. And that is just not consistent with any of the cases, opposing counsel sites, no cases where any policy of this nature has been upheld in the college level, a ban on offensive speech or inappropriate material at the university level. We cited a directly on point case from the third circuit, the McCauley case, where it was a similar ban on offensive signs. And they didn't respond to it in their briefing. They don't play to any cases that allow this level of discretion. And so on that basis, no support for the conclusion that this court could affirm or could allow universities to implement this kind of proposal. The counsel suggests that dividing these standards by who the likely readers might be, whereas K through 12, as opposed to college, doesn't really work because you've got people coming onto the campus that don't fit into neat categories. Others that might view this as having the imprimatur of the school. What's your response to his argument in that regard? On the first point about the people, students, high school students or families might come, that's true in any public forum or any forum at all. That's true in the local park. That was true in the case of the Supreme Court had the Reynolds case about the drive-in movies were showing a content that might've been inappropriate for children. Anytime there's public speech in public, there's a chance that someone young or impressionable might hear it. But that's never been a justification for imposing restrictions. This court and the Supreme Court have repeatedly said that universities are bastions for free speech. They're important places for freedom of expression and debate. This court in the Oyama case. Does it matter if that's not true anymore? I would like to see it be that way. And the courts play an important role in ensuring that freedom of expression and unpopular ideas are not chilled. It's even more important now than ever that this court and courts take a strong stance in defense of free speech in the university setting. In Oyama, the court said that the school speech doctrine failed to account for the vital importance of academic freedom at public colleges and universities. And the Supreme Court has emphasized that that is vital and essential to our democracy in the Kishin case and elsewhere that having universities be places where students can and faculty and everyone can be exposed to difficult ideas, challenging ideas that they disagree with is vital to our democracy and to the society that values the First Amendment and protects the First Amendment. And the Supreme Court has allowed even highly offensive speech in the university setting. The Papish case is the best example of this, where it involved a flyer that had an image of a policeman raping the Statue of Liberty, raping Lady Justice, and the symbolic of criticisms of the government's policies. And so the flyers in this case are well in line and far less graphic and obviously on their face offensive than the speech there. And yet that was upheld in the Papish case. And so universities are bastions for free speech. And that's really one of the reasons that the Hazelwood precedent should not apply, is that unique environment, coupled with the maturity of the students, the lack of the in loco parentis relationship that there's in the K-12 setting. And going to your question again, Judges, about imperturbe and the appearance of the university's kind of endorsement. This is a student bulletin board. AR-5550 designates it for student speech. The record shows that flyers from student groups would routinely get approved in seconds or minutes. They would go to the office and get a stamp. These groups are independent from the university. They're run by students. They're expressing themselves. And so there's no basis for an imperturbe of student expression. And that's very different from the Planned Parenthood and Hazelwood cases, where the record showed that the principal of the school and the teachers leading the journalism class or the newspaper class were very involved in micromanaging what kind of speech would be allowed to be there. And that's not the case here. There's no evidence of that in the record here. So there's no basis for the idea of an impermature concept in this case. So even if Planned Parenthood could apply, Hazelwood could apply to the university setting, which this court has repeatedly refused to do in Oyama and Downs numerous times to have the opportunity and has chosen not to for the reasons I've already discussed. Even if they could do it, there's no basis in the record to say that there's pedagogical reasons here or that this is a curricular speech from the university. And then finally, mentioning in this context, mentioning Planned Parenthood and Hazelwood, also Planned Parenthood emphasized, and this court did so in Downs as well, that even in school speech settings, viewpoint discrimination is not permissible. That's a clear ruling of the Downs case. The court there distinguished between school-sponsored speech, where it said that they would apply the viewpoint discrimination microscope to the policy in question and a kind of pure government speech scenario where that's a different category. They said that that would not apply. But in the school speech context, it does still apply with full force. The same is true for viewpoint, for vagueness and over-breath as well. Those doctrines apply with full force regardless of the forum. And so the district court correctly said it did not need to decide what the forum was, because in any forum, a policy that is viewpoint-based on its face, banning offensive speech and inappropriate material, which the Supreme Court in Mattel v. Tam and just recently in the 303 Creative case said is viewpoint discrimination. That's impermissible. This kind of broad policy is impermissible really in any forum. It cannot be defended. And so the district court correctly granted a preliminary injunction. It correctly ruled that plaintiffs were likely to succeed on the merits. And on any of these grounds on viewpoint discrimination, over-breath or vagueness, this court can affirm the district court's granted a preliminary injunction. Thank you. Thank you, counsel. I'll just touch on a few of these issues briefly and then any questions you have. I was surprised to hear a suggestion that there had been no cases or nothing cited to say that similar, less specific instructions had been cited as evidence in other cases that similar terminology for school-sponsored speech had been approved. Of course we did. It's the two most important cases before us. In Hazelwood, our U.S. Supreme Court set this rule and they said the only thing that the school needed to state was legal, moral or ethical, completely up to the discretion of the principal. That's the instruction that is allowed when you get to the point where it is school-sponsored speech. It's the imperpeture of the school. And there are questions about whether the school has a discretion which they're giving great deference to actually adjudicate down through their student body. The other one is Planned Parenthood. And the instruction of Planned Parenthood, there could be nothing so vague or overbrought except that the Ninth Circuit has said it's approved for a school to have a rule that says we're not gonna let you post anything that does not serve the best interests of the school at the discretion of the principal. And it's because of the possibility that the actual use of that language would actually give the public to believe the imperpeture of the school is dedicated to that topic. The courts have been clear that schools are not required to take one position or the other or be seen as taking one position or the other on issues that are in dispute, that are up controversy. And the language in Hazelwood which gets approved again in Planned Parenthood is very clear that we don't wanna make our schools the battleground. So we don't wanna say we're gonna put this up there you have to let the first flyer go up and then we're gonna let you force the second one and that whole wall is gonna be a battleground of students with things that you don't approve of either one. Either that you have an imperpeture problem or that you've created a battleground and the discretion under those cases the Ninth Circuit and the US Supreme Court is given to a great deference to the school. I'd noticed Pappage, not a school speech case Downs, government speech, not a school speech case. McCulley, rape harassment, not a school speech case. None of those cases are applicable. The ones to follow are Hazelwood and Planned Parenthood follow our four other circuits we apply them to this case and given the language of those particular rules and those schools are just like AR 5550 and it should be applied. By the way, you have no... Lastly, I'll say you have no determination from the district court that there's viewpoint discrimination or forum. We don't have any of that. None of that was decided upon. Thank you. All right. Thank you, counsel. Flores B. Bennett will be submitted and the session of the court is adjourned for today. All rise. This court for this session stands adjourned. Thank you. Of course, thank you. I got it. Yeah, I'm gonna bring her back. You got it. Wow.
judges: WARDLAW, SMITH, Rayes